## AMERICAN CHAIN CO., Inc., v. CHESTER N. WEAVER CO., Inc.

(District Court, N. D. California, Second Division. August 4, 1924.)

No. 641.

1. Patents ⟲328 — 1,191,306, for resilient spring auto bumper, held entitled to substantial range of equivalency, and infringed.

Hoover patent, No. 1,191,306, a resilient spring automobile bumper having ends curved inward and rearward, so as to form loops, *held* novel, useful, entitled to substantial range of equivalency, and infringed.

2. Patents ⟲91(1)—Where applications pending at same time, reduction to practice at anterior date may be established by either party by preponderance of evidence.

Where applications for patents are pending at same time, one whose application is second, if he seeks priority, has burden of establishing by preponderance of evidence that he has reduced his invention to practice anterior to his opponent's application, whereupon opponent becomes entitled to show by same degree of evidence that he had reduced his invention to practice at still earlier date.

3. Patents ⟲314—Findings of master entitled to presumptive verity, but may be set aside by court.

Findings of master to whom patent controversy has been submitted are entitled at least to presumptive verity, though they may be set aside by court.

4. Patents ⟲90(5)—Device, though somewhat incomplete, held reduction of invention to practice.

That automobile bumper installed by inventor was crude, unsightly, and somewhat incomplete did not prevent it from constituting reduction to practice, where it put into effective practice the germ of the invention previously conceived.

In Equity. Suit by the American Chain Company, Inc., against the Chester N. Weaver Company, Inc. Decree for plaintiff.

On September 11, 1922, counsel stipulated that the cause might be referred to Hon. Harry M. Wright, of San Francisco, as special master in chancery, "to take the testimony and report the same to the court, with his findings and conclusions thereon, subject to the full consideration of the court." An appropriate order was entered by the court in pursuance of this stipulation. After hearings had, a draft report

was filed by the master on the 27th of November, 1922. A motion for a rehearing was heard before the master and denied, but upon application to the court a rehearing was ordered by the court and the same was had and a final report, favorable to the contentions of plaintiff, was filed by the master September 4, 1923. The proceeding herein is upon exceptions taken to the master's report.

The device involved in the patent relied upon by plaintiff was what is known to the trade as the Hoover Bumper or impact member for automobiles. It is made of flat strip spring steel. It consists of an impact member extending across the front of the automobile, substantially from tire to tire. The ends of this impact member are curved rearwardly and inwardly, so as to form loops, and the inner ends of the loops are shaped so that they may be attached by various brackets or other fittings to the projecting frame ends of the car. Thus it constitutes a flat strip steel spring held in position in front of the automobile, and is capable of yielding in any direction in a horizontal plane, while being substantially rigid in a vertical plane because of the vertical width of the steel strip, which is ordinarily in the neighborhood of two inches in vertical width by three-eighths or one-half an inch in thickness.

The Hoover claims held to have been infringed by the device put out by defendant are Nos. 1, 3, and 6, and read as follows:

"1. In a fender, the combination with a vehicle frame, of a continuous spring arranged transversely in front of the frame, the ends of the spring being bent upon itself to the rear and inwardly, the bends in said spring forming the ends of the fender, and means secured to the frame and to the said ends of the spring at a distance from the said bends and in rear of the main portion of the spring whereby the spring is supported."

"3. A bumper for vehicles comprising a continuous spring buffer bar for extension transversely of the vehicle, said bar having integral spring-supporting members, the said supporting members constituting a continuation of the body member and being extended laterally therefrom, and then rearwardly."

"6. A bumper for vehicles comprising a spring buffer bar for extension transversely of the vehicle, said bar being of continuous spring material throughout the entire length thereof, the ends of the bar being bent first upon itself to the rear and then inwardly to form integral spring supporting members, the bends in said bar forming the ends of the bumper."

The infringing device, known as the Lyon bumper, is practically identical with the Hoover bumper in construction, purpose, and effect, differing from it only in one minor feature, that is probably an improvement on the Hoover construction. Like the Hoover bumper, it is made of flat strip steel; it has loops at each end of the impact bar; the inner ends of the loops are recurved to form supporting arms, by which the bumper may be attached to the frame of the automobile; in all of which respects it is the same as the Hoover bumper. The particular feature, which probably serves as an improvement, is the cutting of the impact bar in two, overlapping these portions, and connecting them with clips, thus making a bumper which can be widened or narrowed, so as to be readily adjustable to car frames of different widths, and also at the same time offering greater strength and stability to the central portion, most likely to be the recipient of impacts.

Among other things, defendant pleaded and argued that certain equities arising out of laches on the part of Hoover, or his assignee, in bringing suit, had converted this action into a stale demand; that in the meantime defendant's business had grown to great proportions. It was also asserted that plaintiff's suit was brought to destroy an honorable competitor (the Metal Stamping Company, the manufacturer of the Lyon bumper, and which company actually defended the pending litigation) for the benefit of a pool controlled by plaintiff, operating in contravention of the anti-trust laws, etc.

In an interference proceeding in the United States Patent Office in 1914, in interference with Fageol, patent No. 1,202,690, Hoover testified respecting his bumper invention substantially to the effect that "I first embodied the invention in issue in a full sized fender which was completed on or about the 15th day of August, 1911." In passing it may be said that the "completed" Hoover invention and device carried a supporting or strengthening member or strip along the front and central portion thereof, which member apparently was not attached to or present on the bumper attached to the "Bulldog" Elmore in 1910.

When Hoover completed his testimony on direct examination before the master, he fell over in a fainting spell or fit, and on resumption of the session, pursuant to

agreement of counsel, he was not cross-examined by defendant's counsel, but instead and in lieu thereof all the testimony in the Fageol interference proceeding, adverted to above, was introduced by defendant by way of impeachment. During the course of the hearings an affidavit was filed by Lyon to the effect that in the course of the above-mentioned fainting fit of Hoover, Hoover stated to him (Lyon) substantially that "it is a shame what they are doing to you out here," and also, "My story will never stand cross-examination; they will annihilate me." Hoover, in an affidavit filed in the proceedings, in response to a motion for rehearing, etc., denied making the statements. Defendant's counsel apparently were almost immediately given information by Lyon of the asserted statement of Hoover, but no cross-examination of Hoover or oral examination of Lyon as to the occurrence was made or had. The master, on the motion for a rehearing, was disposed to discredit Lyon's testimony, as to the date of invention and reduction to practice by him, in its entirety, because of certain more or less questionable activities indulged in by Lyon in the matter of securing new testimony to be adduced on the rehearing, if the same should be had.

Frederick S. Duncan, of New York City, and John H. Miller and Chas. E. Townsend, both of San Francisco, Cal., for plaintiff.

Samuel M. Shortridge and William K. White, both of San Francisco, Cal., and Drury W. Cooper, of New York City, for defendant.

BLEDSOE, District Judge (after stating the facts as above). The determination of this cause has been subjected to unusual delay, due primarily to pendency of prior and important matters in my own court, and secondarily to the suggestion, advanced to me some months ago by certain of the counsel in the case, that proceedings looking toward a compromise were pending. The evidence in the case having been heard by another, the record being long and complicated, and there being so many charges and countercharges of deceit, falsehood, chicanery, subornation, and the like relating to the respective dates of invention and reduction to practice of the two opposing patents, in justice to the rights of the parties, a careful, discriminating, and satisfactory analysis of the matters involved could not be had, save upon ample time being continuously afforded therefor. Such time has been denied to me until lately. The careful reading of the evidence alone, with the accompanying references from time to time to supporting and contradictory matters, in order that a vivid picture of all the asserted corroborations and contradictions might be had, has been a task of unusual magnitude.

I have endeavored to perform it with care, precision, and impartiality, having in mind at all times the importance of the cause and the necessity for a just determination thereof in so far as the same lay in my power. While I have, as I conceive, carefully examined and duly considered each item of evidence, oral, documentary, and physical, introduced in the cause, I cannot, out of consideration for other matters now pressing upon me for determination, take the time necessary to an analytical and comprehensive recital of them in this memorandum. It must suffice that my conclusions be very generally expressed. I hope I need not have to assure counsel that no point advanced by them has escaped my careful consideration.

[1] I accept and approve, in the main, the conclusions announced by the master respecting the scope and construction, together with the infringement had, of plaintiff's patent (Hoover, No. 1,191,306, applied for January 24, 1912, and granted July 18, 1916). There can be no doubt in my estimation but that Hoover's invention, in so far as it related to a continuous resilient spring bumper effect, was both entirely novel and exceedingly useful. Its novelty and merit entitle it to a reasonably substantial range of equivalency. That it is infringed by the defendant's device, plural in members, but unitary in structure and effect, is equally clear. I do not discover any "equities" in defendant's case, as contended for, sufficient to invalidate plaintiff's cause of action.

[2] The remaining question, and the one to which most of the evidence before the master and most of the argument before the court were directed, is as to priority of invention and reduction to practice as between Hoover, plaintiff's assignor, and Lyon (No. 1,198,246, applied for April 21, 1913, and issued September 12, 1916), defendant's licensor. In this connection I am constrained to follow the holding of the Circuit Court of Appeals for this circuit in Willard v. Union Tool Co., 253 Fed. 48, 51, 165 C. C. A. 646. Both applications (Hoover's and Lyon's) were pending at the same time in the Patent Office; Hoover's being first in time, however, both of application

as well as of issuance. In the absence of countervailing considerations, then, he would be entitled to priority of right. Lyon, however, by evidence introduced and in defeasance of Hoover's prima facie priority, sought to show invention and reduction to practice anterior to Hoover's application, the presumed date of his reduction to practice. In so doing, the applications "being pending at the same time," "the burden of proof is on him whose application is second to show that he was the first to reduce the invention to practice, and that in sustaining such burden he is controlled by the ordinary rules of courts of law with respect to the burden of proof, and is required to establish his priority only by a fair preponderance of the evidence, and not by proof conclusive in character, or beyond a reasonable doubt." Willard v. Union Tool Co., supra.

As stated, defendant undertook to show a reduction to practice by Lyon as of a date anterior to Hoover's application. This, defendant was called upon to do "only by a fair preponderance of the evidence," and, assuming its success in that regard, plaintiff was then entitled to show, if possible, by a similar preponderance of evidence, a reduction to practice by Hoover antedating that of Lyon. This was attempted, and, as before stated, assuming the sufficiency of Lyon's showing, under the rule, the real question in the case is: Did plaintiff show, by a fair preponderance of the evidence addressed to that point, a reduction to practice by Hoover antedating the reduction to practice proven by Lyon? From a careful consideration of the evidence introduced before the master relevant to that particular issue, I am constrained to find and hold that this question should be answered in the affirmative.

[3] In this behalf, without indulging in detailed statement respecting the nature or effect of the report and findings of the special master, it must suffice to indicate my belief that at least there is a presumptive verity attaching to those findings; else, why any findings at all? Why not a reference to a mere commissioner, to see that the evidence was properly received and duly transmitted to the court? I have weighed the testimony, therefore, in the light of the presumption attaching to the correctness of the master's conclusions respecting the validity and bona fides of Hoover's claims. If plain error in the master's conclusions as to those matters had been apparent, or if I had found occasion to come to a con-

1 F.(2d)—38

trary conclusion, I would not, of course, have hesitated to set aside his findings.

[4] From a careful consideration of all angles of the controversy, however, I cannot come to the conclusion that Hoover perjured himself in his testimony relating to his conception of his invention and his reduction to practice thereof in 1910. In addition, I think he was substantially supported and corroborated by other witnesses, and by circumstances importing in themselves no insignificant element of circumstantial verity. For example, it seems clear that in the spring of 1910 he regarded his newly conceived bumper as of much more importance financially than his auxiliary automobile spring. It is hardly possible, therefore, that he would have directed all his time to the auxiliary spring, and no time at all to the development of the more desirable asset, the bumper. That his actual reduction to practice in 1910 on the Smith "Bulldog" Elmore resulted in a crude, unsightly, unfinished, unsatisfactory, and somewhat uncompleted instrumentality, I am convinced; but that it contained all of the effective and substantial elements of his invention is equally clear. It was a step in the perfecting of a commercial article, similar to one of the numerous steps taken by Lyon later; but it was nevertheless a reduction to practice, in that it did actually put into effective practice the germ contained in the invention previously conceived.

It seems clear from all of the evidence, and is without contradiction, as I understand the contentions of defendant, that Hoover did install a bumper on Smith's "Bull pup" Elmore in the summer or early fall of 1911. The pictures of this "Bull pup" bumper indicate to my mind very clearly that it was a completely perfected article, and really made in the similitude of those actually commercially vended with quite considerable success only a few months later. Defendant would have the court believe, apparently, that this completed and perfected article sprang Minerva-like, full panoplied, from the brain of Jove, without any previous experimentation, and without any considerable unsuccessful effort. This, I am constrained to believe, could hardly have been the fact. In the very nature of things it must have been true that, following the original conception, there was experimentation; there was a construction of a crude, ill-fitting, unfinished, and unsatisfactory device. In order that it might be demonstrated, in order that its utility and

efficiency might be determined, it was almost an absolute necessity that it should have been attached to some automobile. The most plausible and the most probable testimony in the case respecting the attaching of such crude and unperfected device, for purposes of measurement no less than of use, to any automobile, is the testimony offered by Hoover and supported by others, to the effect that such attachment was had on the "Bulldog" in the summer of 1910. This, as stated, constituted a reduction to practice long anterior to that asserted by Lyon in his testimony.

The crudity and uncommercial aspect of Hoover's 1910 instrumentality seem to explain the seeming irreconcilable inconsistencies between Hoover's testimony in his interference proceeding with Fageol and his testimony before the special master. If defendant's counsel had cross-examined Hoover, as they had a perfect right to do, upon this particular phase of the case, as well as upon the sworn assertion of Lyon that Hoover practically confessed to him that he was guilty of fraud, deceit, and imposition, the court might have found occasion or justification to doubt Hoover's story. The absence of such cross-examination, however, Hoover being available at all times, robs the contentions of defendant's counsel of much of their force. I have weighed them carefully, however, and at no time have they been lost sight of in my deliberations. Certain animadversions contained in the master's report, seemingly unnecessary to a judicial determination of the matters involved, do not meet with my approval. They are beside the question as to the ultimate right and justice of the cause, and have served merely to cause me the more carefully to scrutinize the evidence relied upon as supporting the master's conclusions.

All in all, I am of the deliberate conviction that the testimony of Hoover to the effect that he did reduce his invention to practice in 1910, as claimed by him, is sustained by the corroborative proofs and sufficiently meets the burden imposed upon him under the decision in the Willard Case. The findings of the special master as upon the evidence, together with his report and recommendations as to the validity of the Hoover patent are approved. In conformity therewith, and in furtherance thereof, a decree containing the usual provisions, to be prepared by plaintiff's counsel, will be entered as of record.